A95A0048, A95A0049. PEMBROKE STATE BANK et al. v. WARNELL et al.; and vice versa.
(461 SE2d 231)

BIRDSONG, Presiding Judge.

These appeals comprise ten volumes and more than 2,000 pages of record and transcripts from four days of jury trial of a motion to enforce attorneys' settlement.

In 1987, L. O. Benton bought 54 percent of Pembroke State Bank's shares but still did not have control of it. Large amounts of shares are owned by sisters Carolyn Bryan and Dorothy Warnell. Miss Warnell, age 81, is an invalid; Mrs. Bryan, age 79, has her power of attorney. Their nephews, Herbert and Brooks Warnell, own fewer shares. Benton needed to purchase more than 900 shares from minority shareholders. When Benton's offer of $3,000 per share was refused, the bank stopped paying dividends. Benton hired attorney Ben Johnson, and in 1990 the bank proposed a reverse stock split whereby minority shareholders' shares would be bought for $2,200 per share. Four shareholders including Herbert and Brooks Warnell hired an attorney, Noel Osteen. Only those four persons signed a retainer agreement, but the agreement states that it "shall [also] apply to [these persons]: Carolyn W. Bryan [176.4 shares], Dorothy Warnell [241.6 shares], [and three others]." None of those persons signed Osteen's retainer.

Osteen resisted the reverse stock split and filed suit for damages, naming as plaintiffs Brooks, Herbert, and the other two family members who signed Osteen's retainer agreement. In March 1991 Osteen and Johnson reached a settlement. Osteen then met with his "clients." Mrs. Bryan was not present, but Osteen explained the settle-

ment to her on the phone. All the Warnells agreed to this settlement, but Osteen did not enforce it. In March 1992 the trial court ordered Osteen to add all his "clients" as plaintiffs so the settlement could be enforced. Osteen notified Hank Haynes, who is a timber consultant and is Mrs. Bryan's friend, and Steve Lewis, an attorney who attended meetings for her. Haynes wrote Osteen that Mrs. Bryan expected the settlement to be enforced. Instead, in January 1993 Osteen negotiated a new settlement.

In February 1993 Osteen met with the Warnells. Haynes attended for Mrs. Bryan and Miss Warnell but had no authority to agree to the new settlement for them. Osteen testified Haynes authorized the settlement. Haynes testified he did not have such authority and that he only said Mrs. Bryan indicated she would do what Brooks did. Herbert was unsure but agreed to go along with the other family members. Brooks was not present; his 40 shares would not affect the deal, but Mrs. Bryan was influenced by his feelings. Haynes, Osteen, and Johnson came up with a "special deal" for Brooks, allowing him to agree to the settlement so as to influence his aunt but then "opt out" himself six months later. In April 1993 all of Osteen's "clients" signed the second settlement agreement except Brooks and the aunts. Herbert then withdrew his agreement. Osteen withdrew from the case.

Mrs. Bryan testified as follows: Hank Haynes went to meetings for her because she had to nurse her sister; he reported to her, but she never told him he could speak for her. She saw no need to be involved in the lawsuit and did not know of Osteen's retainer signed by her nephews. No one had authority to hire a lawyer for her. Nobody had her power of attorney. She never considered Osteen her attorney; "he has never communicated with me except one time, and [Steve Lewis] was my attorney." (Lewis did not testify.) The only letter she got from Osteen was one saying he was "no longer [my] attorney, [which] was quite a shock 'cause I didn't know he was my attorney in the first place." Osteen called her once about the first settlement; he said he could get $2,725 per share; she agreed because it was in cash and because her family could not negotiate without her. It upset her to learn Osteen "was getting $300,000 for his fee and was not giving us but $2,725 per share and he was getting all that money off of [our] stock. [And] I was . . . paying my own attorney. So I was paying twice." The second agreement would allow Benton not to pay for seven years; she did not sign it because she did not like it.

Herbert Warnell testified he did not know the retainer agreement he signed included his aunts. He went along with the second settlement only so his family could make the deal. He changed his mind after learning Brooks and his aunts were not signing and that the family was not getting the 900 shares needed to make the deal.

Brooks Warnell testified he felt Osteen tricked him by putting his aunts' names on his fee agreement. In 1991 he agreed to the first settlement. A year and a half passed; the family waited to get paid but heard nothing. Then they heard the court had ordered Osteen in September 1992 to enforce the first settlement. They got a transcript of those proceedings from a court reporter and when they read it, they were "floored. He was just arguing [not to enforce the first settlement]. He wasn't arguing for us. . . . He just kind of went in with them." Osteen proposed a deal where the family would get paid in 12 years; Osteen would get his $300,000 up front "and us not get a thing. And so we all turned it down." Brooks did not like the second settlement. He did not like the "special deal" the lawyers arranged for him to influence his aunt.

Opposing counsel Johnson claims he never had "one iota of doubt that Mr. Osteen had anything other than complete authority" to represent and settle for Brooks and Herbert Warnell, Mrs. Bryan, and Miss Warnell.

To enforce the second settlement, in June 1993 the trial court again ordered all of Osteen's clients to be named plaintiffs. Brooks and Herbert Warnell, Mrs. Bryan, and Miss Warnell hired new counsel and sued Benton et al. for gross mismanagement and bad faith.

The trial court held a jury trial on the issue whether these four parties are bound by the second settlement. The jury charge followed *Brumbelow v. Northern Propane Gas Co.*, 251 Ga. 674 (308 SE2d 544) and instructed as follows: "[A]ny restriction as to the authority of a [party's] attorney not communicated to or known by the opposing party or his counsel has no effect on the enforceability of a settlement agreement. . . . If counsel has negotiated and agreed on a compromise of a case prior to trial an attempt by the parties to withdraw the attorney's authority [is] inconsequential and without legal effect. . . . Under Georgia law an attorney of record has apparent authority to enter into an agreement on behalf of his client and the agreement is enforceable against the client. . . . The authority may be consider[ed] plenary unless it is [otherwise] communicated to the opposing parties. Therefore, from the perspective of the opposing party in the absence of knowledge of express restrictions of an attorney's authority the . . . client will be bound by the acts of his attorney within the scope of his apparent authority. . . . Where the dispute as to an agreement is . . . between the attorney and his client . . . over the attorney's authority and where the opposite party is ignorant of any limitation upon the attorney's authority the client will be bound by his attorney's actions."

A special verdict form posed four questions: "Did attorney Noel Osteen have actual or apparent authority to represent [(1) Brooks Warnell; (2) Herbert Warnell; (3) Mrs. Bryan and Miss Warnell]

. . .? (4) Did Defense counsel BEN JOHNSON know or should he have known of any limitation of this authority?"

The jury answered "yes" to all four questions. The trial court found Osteen was Herbert and Brooks Warnell's attorney of record; that the fact that they were named plaintiffs was a sufficient basis from the perspective of opposing counsel to conclude Osteen was authorized to settle for them; and that their attempts to withdraw their consent did not limit Osteen's authority to make the settlement. As to Mrs. Bryan and Miss Warnell, the court found Osteen was their attorney in negotiating the settlement but that opposing counsel knew Osteen was not their attorney of record in the litigation; that this cast the burden on opposing counsel to determine whether there were limits on Osteen's authority; and that any doubt must be resolved in their favor.

In Case No. A95A0048 Benton et al. contend that since the jury found Osteen had actual or apparent authority to represent Mrs. Bryan and Miss Warnell, the trial court was required to find them bound. In Case No. A95A0049 Herbert and Brooks Warnell contend the trial court erred in enforcing the settlement against them. *Held*:

1. In the first place, opposing counsel's assertion that he had no doubt Osteen had authority to dispose of the property of these four parties is wholly self-serving. Opposing counsel was *mistaken* in this, and he did not ascertain the facts from the opposing parties; his client could not by virtue of his mistake acquire a superior equity over the innocent client whose attorney acted outside his actual authority. Moreover, in this case, opposing counsel had to approve the "special deal" by which one nephew would influence his aunts; this taints opposing counsel's reliance on anything.

This costly litigation comes of too much reliance on *Brumbelow* as giving lawyers "apparent authority" to dispose of clients' property. See *Lord v. Money Masters,* 210 Ga. App. 21 (435 SE2d 247); *Addley v. Beizer,* 205 Ga. App. 714 (423 SE2d 398); *Lewis v. Uselton,* 202 Ga. App. 875 (416 SE2d 94); *Vandiver v. McFarland,* 179 Ga. App. 411 (346 SE2d 854), as to all of which certiorari was denied. See *Tifton Bank &c. Co. v. Knight's Furniture Co.,* 215 Ga. App. 471 (452 SE2d 219). And see *City of Atlanta v. Black,* 265 Ga. 425 (457 SE2d 551), where the Supreme Court held "this Court has limited the application of *Brumbelow.*"

Before *Brumbelow,* an attorney's agreement to compromise "raise[d] no presumption that the attorney was authorized by his client to make such settlement" (*Evans v. Atlantic Nat. Bank &c.,* 147 Ga. 621 (3) (95 SE 219); *Addley,* supra at 719-720), and an attorney who relied on a settlement without ascertaining its authority did so "at his peril." *Sonnebom & Co. v. Moore Bros.,* 105 Ga. 497 (1) (30 SE

947); see also *Evans v. Brooke*, 182 Ga. 197, 207 (184 SE 800); *Davis v. First Nat. Bank of Blakely*, 139 Ga. 702, 713 (78 SE 190); 30 ALR2d 944, 945; 7 AmJur2d § 156; 7A CJS § 214. A conclusion to the contrary in some cases was without foundation. See *Petty v. Complete Auto Transit*, 215 Ga. 66 (1) (108 SE2d 697), relying on *Reece v. McCormack*, 188 Ga. 665, 668 (4 SE2d 575); but see the cases relied on by *Reece*. The cases relied on in *Brumbelow* had to do with management of a case, not authority to settle. *Vandiver*, supra at 412; *Addley*, supra at 718-719.

The legislature has placed express limits on attorneys' authority to dispose of clients' property. "Without *special authority*, attorneys cannot receive anything in discharge of a client's claim but the full amount in cash." (Emphasis supplied.) OCGA § 15-19-6. Further, State Bar DR 7-102 (a) (9) mandates that a lawyer *shall not* "settle a legal proceeding or claim without obtaining proper authorization from his client." As a matter of law, opposing counsel knew these laws. He could not assume another attorney has "plenary authority" which he knows he himself does not have. Courts cannot give attorneys "apparent" authority to do what the legislature forbids them to do "[w]ithout special authority." Where the legislature has expressly restricted attorneys' authority, courts may not expand that authority. *City of Atlanta*, supra.

2. The trial court's first error in this case was to fashion a jury charge out of *Brumbelow*. This charge forced the jury to reach a contradiction in terms: that lawyers *have authority* to dispose of a party's property even though they are *without authority* to do so. The charge was error. See *Addley*, supra.

3. The second error lay in posing the question whether Osteen had apparent authority *to represent* Mrs. Bryan and Miss Warnell. *Brumbelow's* "apparent authority" statement is not pertinent to determine whether a lawyer *represents* a party. Whether a lawyer represents a party is a question of fact, not appearances, unless the party *knowingly* caused the attorney to appear as his agent in that matter. *Addley*, supra at 718, quoting *20/20 Vision Center v. Hudgens*, 256 Ga. 129 (345 SE2d 330).

4. The question posed to the jury whether Osteen had authority *to represent* Brooks and Herbert Warnell was the third error. It is undisputed Osteen represented them, but this does not mean he had "plenary" authority to settle their interests in violation of OCGA § 15-19-6. A correct charge would be based on the laws of attorneys' authority (OCGA § 15-19-5) and special agents (OCGA § 10-6-50). See also *Lord*, supra; *Addley*, supra.

5. The charge that the settlement could not be enforced if opposing counsel knew or should have known of limitations on Osteen's authority was certainly correct, and the jury's findings on that question

required the trial court to find Brooks and the aunts were not bound by the settlement. As for Herbert, who agreed and then withdrew his consent, it seems that, like other members of his family, he struggled in a mire of conflicting interests and miscommunication, trying to do what he thought they were doing but lacking information. The entire circumstances raise such questions of conflict of interest and so taint Herbert's agreement that it cannot be compelled.

The judgment binding Brooks and Herbert Warnell is reversed, and the judgment refusing to bind Mrs. Bryan and Miss Warnell is affirmed.

*Judgment affirmed in part and reversed in part. Johnson and Smith, JJ., concur.*

## On Motion for Reconsideration.

Benton et al. say we have overruled *Brumbelow v. Northern Propane Gas Co.*, 251 Ga. 674 (308 SE2d 544), which of course we cannot do. *Brumbelow* merely answered questions certified by the Court of Appeals; by addendum, the Supreme Court said: "It is the function of the Court of Appeals to apply these answers to the facts as it finds them." Id. at 677. This we have done. Although the trial court's charge forced the jury to find Osteen had "apparent authority" of these four persons, the jury nevertheless made the settlement unenforceable by finding that attorney Johnson knew or should have known of restrictions on Osteen's authority. We predicted in *Vandiver v. McFarland*, 179 Ga. App. 411, 413 (346 SE2d 854), that if told attorneys could dispose of their clients' property without authority, the public would "recoil in horror and deny it," and that is what we think this jury did in its findings.

Benton construes *Brumbelow* to say an attorney has absolute authority to dispose of his client's property. The Georgia Supreme Court has never said an attorney is owner of his client's property, which is what Benton suggests. Agency law does not permit an agent to create his own "apparent authority." *Addley v. Beizer*, 205 Ga. App. 714, 717 (423 SE2d 398). "[A]n attorney . . . has no implied power by virtue of his general retainer to compromise and settle his client's claim." 30 ALR2d 944, 945; 7 AmJur2d § 156. "Where . . . there has been nothing beyond a mere employment or retainer of the attorney . . . it is incumbent upon the opposing party to ascertain at his peril whether actual authority to [make a compromise] has been conferred upon the attorney. . . . [S]uch other party is charged with knowledge that agreements of compromise or settlement do not come within the implied authority of the attorney." 7A CJS § 214 (b).

If an attorney has "apparent" authority to dispose of a client's property, he immediately becomes his client's adversary. The concept

promotes uncertainty in legal dealings and propagates litigation. For these reasons *Brumbelow* is narrowly construed. *Lewis v. Uselton*, 202 Ga. App. 875, 878 (416 SE2d 94). Benton says a client wronged by an unauthorized settlement may sue his lawyer, but we fail to see how the necessity to sue one's own lawyer can possibly be an advantage to the client. In *Davis v. First Nat. Bank of Blakely*, 139 Ga. 702, 713 (78 SE 190), the Supreme Court said that if unauthorized settlements are routinely enforced, "occasions might arise where a client's entire property . . . might be agreed away, in spite of his protest, and he might be remitted to a suit [against his own attorney] by which nothing could be realized." An attorney who enters an unauthorized settlement may, with equal design, make it impossible for the client to prove his loss.

The entire problem need never arise. The lawyer has only to obtain the "special authority" required by OCGA § 15-19-6. The statement in *City of Atlanta v. Black*, 265 Ga. 425, 427 (457 SE2d 551), that "the authority of private sector attorneys may be considered plenary under *Brumbelow*" was dictum. The matter of an attorney's authority is controlled by OCGA § 15-19-6. This was settled by *Kaiser & Brother v. Hancock*, 106 Ga. 217 (32 SE 123) 100 years ago and by many other cases, and the narrow language used in *Brumbelow* did not overrule those cases.

*Motion for reconsideration denied.*

DECIDED JUNE 30, 1995 —
RECONSIDERATION DENIED JULY 26, 1995 —

*Glover & Davis, J. Littleton Glover, Melissa C. Cordell*, for appellants.

*Adams & Ellis, Tracy A. O'Connell, Ronald C. Berry, Laura J. Tromly*, for appellees.